**CASE NO. 22-1365**
UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

Elisabeth Epps,
Ashlee Wedgeworth,
Amanda Blasingame,
Maya Rothlein,
Zach Packard,
Hollis Lyman,
Cidney Fisk, and
Stanford Smith,
     *Plaintiffs-Appellees*

v.

City and County of Denver, City of Aurora, Jonathan Christian, Keith Valentine,
David McNamee, Patricio Serrant, Mathews Brukbacher,
     *Defendants-Appellants.*

On Appeal from the United States District Court for The District of Colorado
Judge R. Brooke Jackson
District Court Civil Case No. 20-cv-01878-RBJ & 20-cv-01922-RBJ-MEH
(consol.)

**REPLY BRIEF OF DEFENDANTS-APPELLANTS**

Michael T. Lowe
David M. Goddard
Heidi J. Hugdahl
Bruno, Colin & Lowe, P.C.
1999 Broadway, Suite 4300
Denver, Colorado 80202
Telephone: (303) 831-1099
mlowe@brunolawyers.comA
dgoddard@brunolawyers.com
hhugdahl@brunolawyers.com
*Attorneys for Defendants-Appellants*
*Serrant, McNamee, and Budaj,*

Peter Ruben Morales
Office of the City Attorney
Aurora Municipal Center, Suite 5300
15151 East Alameda Parkway
Aurora, CO 80012
Telephone: (303) 739-7030
pmorales@auroragov.org
*Attorneys for Defendants-Appellants*
*City of Aurora*

i

# TABLE OF CONTENTS

Table of Authorities ................................................................... iii

Introduction ....................................................................................1

Argument..........................................................................................2

    I.     This Court properly has jurisdiction to review this interlocutory appeal................................................................................2

    II.    The District Court erred in finding that the law which Plaintiffs' claim was violated was clearly established at the time of the Aurora Officers' conduct.....................................................................6

    III.   The District Court erred in finding there was a constitutional violation By the Aurora Officers .......................................................14

    IV.   The District Court erred in allowing a Fourth and Fourteenth Amendment Claim to proceed simultaneously ..................................24

    V.    Should this Court find that the Aurora Officers did not commit a constitutional violation, then the City of Aurora should be dismissed ...........................................................................25

Conclusion ....................................................................................26

Certificate of Service ..................................................................27

Certificate of Digital Submission ................................................28

Certificate of Compliance with Type-Volume Limit ...................29

Certificate of Exact Copies..........................................................30

# TABLE OF AUTHORITIES

**CASES** **PAGES**

*Anderson v. Creighton,* 483 U.S. 635 (1987) ..........................................................7

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ................................................................6

*Behrens v. Pelletier*, 516 U.S. 299 (1996) ..............................................................4

*Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012)......................................19

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) ........................20

*Buck v. Albuquerque*, 549 F.3d 1269 (10th Cir. 2008)............................8, 9, 10, 14

*Cortez v. McCauley*, 478 F.3d 1108 (10th Cir. 2007) ......................................12, 13

*County of Sacramento v. Lewis*, 523 U. S. 833 (1998) ..........................................25

*Crowson v. Wash. Cty. State of Utah*, 983 F.3d 1166 (10th Cir. 2020) ................26

*District of Columbia v. Wesby*, 138 U.S. 577 (2018) ..............................................7

*Don't Shoot Portland v. City of Portland,*
    503 F. Supp. 3d 1022 (D. Or. 2020)......................................................21, 23

*Duda v. Elder*, 7 F.4th 899 (10th Cir. 2021) ...........................................................3

*Dundon v. Kirchmeier*, 577 F. Supp. 3d 1007 (D.N.D. 2021) ...................14, 15, 16

*Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008) ............................8, 9, 10, 14

*Forrester v. City of San Diego*, 25 F.3d 804 (9th Cir. 1994) ...........................19, 20

*Garrett v. Stratman*, 254 F.3d 946 (10th Cir. 2001)................................................4

*Graham* v. *Connor*, 490 U. S. 386 (1989) .......................................10, 11, 13, 17, 25

*Green v. Branson*, 108 F.3d 1296(10th Cir. 1997) ..................................................24

*Hemry v. Ross*, 2023 U.S. App. LEXIS 5705 (10th Cir. 2023) ............11, 12, 13, 17

*Holland v. Harrington*, 268 F.3d 1179 (10th Cir. 2001) .......................................24

*Hunter v. Bryant*, 502 U. S. 224 (1991) .....................................................................7

*In Fraser v. City of New York*, 2022 U.S. Dist. LEXIS 137335 (E.D.N.Y. 2022) .25

*Jackson v. City of Bremerton*, 268 F.3d 646 (9th Cir. 2001) .................................19

*Jurkowski v. City of Seattle*, 2017 WL 4472859 (W.D. Wash. 2017) ....................19

*Kisela v. Hughes*, 138 S. Ct. 1148 (2018) ................................................................11

*Leatherwood v. Welker*, 757 F.3d 1115 (10th Cir. 2014).........................................4

*Lewis v. Tripp*, 604 F.3d 1221 (10th Cir. 2010) ...................................................5, 25

*Martinez v. City of Aurora*, 2016 U.S. Dist. LEXIS 2272 (D. Colo. 2016) ..........26

*Medina v. Cram*, 252 F.3d 1124 (10th Cir. 2001) ....................................................4

*Myers v. Okla. Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313 (10th Cir. 1998) ...........25

*Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) ...........................................14

*Plumhoff v. Rickard*, 572 U.S. 765 (2014) .........................................................4, 11

*Reichle v. Howards*, 566 U. S. 658 (2012) ...............................................................7

*Scott v. Harris*, 550 U.S. 372 (2007) ........................................................................5

*Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146 (10th Cir. 2006) .............................24

*Surat v. Klamser*, 52 F.4[th] 1261 (10th Cir. 2022) .............................................3, 5, 6

*Tierney v. Davidson*, 133 F. 3d 189 (2d Cir. 1998) .................................................25

*Torres v. Madrid*, 141 S. Ct. 989 (2021) .....................................................14, 15, 16

*Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154 (10th Cir. 2021) ................3, 5, 6

*Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006) ........................................4

*Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008) .................................................17

*White v. Pauly*, 580 U.S. 73 (2017) ......................................................................11

## INTRODUCTION

As turbulence and social and political unrest swept the country in the wake of George Floyd's death, cities and their law enforcement agencies worked to balance the guarantees afforded under the First Amendment with the interests of protecting lives and property from mass protests—some of which were violent. The City of Denver was no exception. Waves of protestors took to the streets, some vandalized property, local businesses and the State Capital while ignoring Denver's state of emergency and the attendant curfew. During this period, the City of Aurora and multiple other law enforcement agencies answered Denver's call for aid to assist in maintaining public order, safety and addressing the mass civil unrest. Despite the efforts of Plaintiffs here to paint a picture of peaceful and lawful protests, the accounts of law enforcement personnel who endured hours and hours of being pummeled with rocks, mortars, chunks of asphalt, bottles, bricks, concrete, unknown liquids, and other potentially lethal projectiles, paint a different account.

During this period, and more specifically on May 31, 2020, after the curfew was in effect and dispersal orders had been broadcast on Long Range Acoustical Devices, Mr. Packard claims gas canisters were deployed in his vicinity and that he "instinctively" kicked one of the canisters back toward a line of police officers. Almost immediately he claims to have been hit in the head with a less-lethal munition, causing him to fall to the ground where he sustained injuries. Meanwhile,

several blocks away, Mr. Duran was live-streaming what he described on video as a "war zone." While Mr. Duran recorded this "war zone," he was generally positioned behind a dumpster that protestors had pushed into the street and were using as cover as they launched and threw projectiles at the police. While recording in this area, he was hit in the groin with a less-lethal 40mm foam impact round.  The impact followed in short order after protestors in front of him had thrown a gas canister or firecracker at officers on the police line.

It is in this chaotic context that the District Court held Aurora Police Officers McNamee, Budaj and Serrant were not entitled to qualified immunity for the force they used in response to the mass civil unrest they were presented.

## ARGUMENT

### I.     This Court properly has jurisdiction to review this interlocutory appeal.

Plaintiffs general argue that this Court lacks jurisdiction over this appeal, stressing that Defendants failed to explain how or why the exceptions permitting a *de novo* review of the District Court's order at summary judgment failed to identify the particular charged conduct that it deemed adequately supported by the record, or the version of events the District Court held a reasonable jury could credit is blatantly contradicted by the record, [Appellee Brief Packard ("Aplee. Br. P.") at pp. 11, 17], but this argument fails to recognize that such arguments are raised throughout the Opening Brief. Mr. Duran makes similar arguments, asserting that Appellants have

asked this Court to go beyond the bounds of its jurisdiction to review certain factual findings and to adopt Defendants' version of events, and that because the appeal does not present "a neat abstract issue of law," it should be dismissed. [Appellee Brief Duran ("Aplee. Br. D.") at p. 10, 13-15]. This is simply not the case, as a review of Appellant's Opening Brief reveals. To the contrary, Appellants are challenging the shortcomings of the legal analysis that the District Court applied to the record facts. And in the qualified immunity context, this is fundamentally the purview of the Courts of Appeal.

Under the collateral order doctrine, this Court may review "decisions that are conclusive on the question decided, resolve important questions separate from the merits, and are effectively unreviewable if not addressed through an interlocutory appeal." *Surat v. Klamser*, 52 F.4th 1261, 1269 (10th Cir. 2022) (quoting *Duda v. Elder*, 7 F.4th 899, 909 (10th Cir. 2021)). This doctrine allows this Court to review interlocutory appeals from "the denial of qualified immunity to a public official to the extent it involves abstract issues of law." *Id.* (quotation marks and citation omitted). Such abstract issues of law are limited to "(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation" and "(2) whether that law was clearly established at the time of the alleged violation." *Id.* (quoting *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1162 (10th Cir. 2021)). More specifically in the Fourth Amendment context, deciding whether

the conduct violates the Fourth Amendment and whether the law is clearly established for purposes of qualified immunity "is a core responsibility of appellate courts." *See Plumhoff v. Rickard*, 572 U.S. 765, 773 (2014); *Garrett v. Stratman*, 254 F.3d 946, 952 n.8 (10th Cir. 2001) (whether a constitutional right was clearly established at the time an alleged violation occurred is a "quintessential" example of a purely legal determination fit for interlocutory review). The United States Supreme Court has further instructed that in the context of reviewing qualified immunity issues, "a court cannot ignore what is plainly supported by the record." *Leatherwood v. Welker*, 757 F.3d 1115, 1118 (10th Cir. 2014) (citing *Plumhoff*, 134 S. Ct. at 2020); *see also Walker v. City of Orem*, 451 F.3d 1139, 1155 (10th Cir. 2006) (noting that undisputed facts in the summary judgment record "are deemed conceded for purposes of our inquiry" and citing *Medina v. Cram*, 252 F.3d 1124, 1131 (10th Cir. 2001) for the precept that a "reviewing court need not look solely to plaintiff's version of facts where facts are undisputed"). This instruction follows from the holding that "[d]enial of summary judgment often includes a determination that there are controverted issues of material fact, … [but that] … surely does not mean that *every* such denial of summary judgment is nonappealable." *Behrens v. Pelletier*, 516 U.S. 299, 312-13 (1996) (citations omitted). Rather, "determinations of evidentiary sufficiency at summary judgment are not immediately appealable merely because they happen to arise in a qualified-immunity case." *Id.* at 313. This Court

4

therefore has jurisdiction to review the denial of summary judgment in this case based on a finding of material issues of fact by taking as true the facts the District Court "conclude[d] a reasonable jury could find … in favor of the plaintiff" to consider "abstract questions of law." *Vette*, 989 F.3d at 1162 (internal quotation marks omitted).

Furthermore, in instances where the District Court does not specify "the particular charged conduct that it deemed adequately supported by the record, this court  may look behind the order denying summary judgment and review the entire record *de novo* to determine for itself as a matter of law which factual inferences a reasonable jury could and could not make." *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010). Additionally, in instances "where the 'version of events' the district court holds a reasonable jury could credit 'is blatantly contradicted by the record,' this court  my assess the case based on its own *de novo* view of which facts a reasonable jury could accept as true." *Id.* at 1225-26 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

Here, as in *Surat*, *supra*, Aurora Officer McNamee, Sergeant Serrant and Officer Budaj ("Aurora Officers") are challenging the District Court's denial of their assertion of qualified immunity based on their view that the facts the District Court determined a reasonable jury could find are inconsistent with the undisputed record facts supporting the totality of circumstances in which the Officers found

themselves. *See Surat*, 52 F.4th at 1270. In addition, and alternatively, the Officers challenge the District Court's denial of qualified immunity based on its finding that the law was clearly established in the circumstances these Officers found themselves at the times in question. This Court therefore has jurisdiction to determine "whether the facts that the district court ruled a reasonable jury could find would suffice to show" Officer McNamee's firing of less-lethal rounds and Sergeant Serrant's authorization to do so, as well as Officer Budaj's firing of less-lethal rounds during the events on May 31, 2020, were unreasonable. *Id.* (quoting *Vette*, 989 F.3d at 1162). Given this view of the facts, this Court may review both the abstract issues of law, and may also determine whether Mr. Packard and Mr. Duran's constitutional rights at issue were clearly established at the time of the alleged violation. *Id.*

**II.     The District Court erred in finding that the law which Plaintiffs' claim was violated was clearly established at the time of the Aurora Officers' conduct.**

The Aurora Officers cannot be said to have violated a clearly established right in the absence of the right's contours being sufficiently definite that every reasonable officer in his/her shoes would have understood that they were violating it. Simply stated, the existing precedent must have placed the statutory or constitutional question "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). This exacting standard "gives government officials breathing room to make reasonable but mistaken judgments" by "protect[ing] all but the plainly incompetent or those

who knowingly violate the law." *Id.* at 743; *see also Hunter v. Bryant*, 502 U. S. 224, 228 (1991) (noting that the standard must be applied to avoid "routinely plac[ing] the question of immunity in the hands of the jury."). It is thus not enough that the encouraged rule is merely suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle v. Howards*, 566 U. S. 658, 666 (2012). Otherwise, the rule is not one that "every reasonable official" would know. *Id.* at 664. (internal quotation marks omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *District of Columbia v. Wesby*, 138 U.S. 577, 590 (2018) (quoting *Anderson* v. *Creighton*, 483 U. S. 635, 641 (1987)).

The District Court thus erred in denying qualified immunity to Officer McNamee because no case clearly establishes that deploying impact munitions toward a protestor engaged in kicking a tear gas canister in the direction of police officers is unconstitutional. The District Court also erred in denying qualified immunity to Sergeant Serrant because no case clearly establishes that authorizing the use of impact munitions on persons engaged in such activity is unconstitutional. The District Court further erred in denying qualified immunity to Officer Budaj

because no case clearly establishes that deploying less-lethal munitions in an effort to move protesters is unconstitutional.

In light of the foregoing, Mr. Packard's contention that the constitutional right in issue "has been clearly established for more than a decade," [Aplee. Br. P. at p. 27], is unsupported by a review of the only two cases upon which the District Court relied in finding the law clearly established for purposes of qualified immunity: *Buck v. Albuquerque*, 549 F.3d 1269 (10th Cir. 2008) and *Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008). Mr. Packard's further claim that the circumstances in *Buck* and *Fogarty* are "strikingly similar" [*Id.*] to the facts here is equally unavailing. So too are Mr. Duran's assertions that the cases are "fundamentally similar" to the facts and circumstances here, [Aplee. Br. D. at p. 40], and that *Fogarty* provides "especially strong support," [*Id.* at p. 42], for clearly establishing the law. These characterizations are arrived at by largely focusing on the fact that the plaintiff in *Fogarty* was shot with a rifle-powered projectile and was a "member of the press." [*Id.*].

Contrary to Mr. Packard's and Mr. Duran's assertions, in addition to highlighting the distinguishing and divergent features of these two cases, [Appellant's Opening Brief ("Apl. Br.") at p. 26-28], the law enforcement personnel in *Buck* and *Fogarty* were intent on taking plaintiffs into custody and actually arrested them. *Buck*, 549 F. 3d at 1277-79; *Fogarty*, 523 F.3d at 1152. What is more,

neither of those cases addresses a use of less-lethal force triggered by plaintiff's attempts to thwart law enforcement's efforts to disperse a crowd composed of a mix of violent and non-violent protestors by kicking deployed gas canisters that had been deployed back in the direction of police (as is the case with Mr. Packard), and neither case addresses a situation where a plaintiff was impacted a single time with a less-lethal munition as the plaintiff stood in close proximity to other protestors engaged in assaultive and threatening behavior with the with police (as is the case with Mr. Duran). Instead, in both *Buck* and *Fogarty* the claims centered on alleged objectionable and unreasonable force arising out of the "seizures" of three *arrested* plaintiffs and objectionable and unreasonable force after the plaintiffs were in custody. *Id.*

In addition to the foregoing, *Buck* and *Fogarty* are further distinguishable in that the plaintiffs had been culled and separated from the larger groups of protestors of which they had been a part at the time force was used against them, and law enforcement personnel were engaging with each plaintiff individually. Neither the plaintiffs nor the defendant officers in *Buck* and *Fogarty* were in positions or circumstances similar to Mr. Duran, Mr. Packard, or the Aurora Officers here at the time force was used. Unlike the plaintiffs in *Buck* and *Fogarty,* Mr. Packard and Mr. Duran were free to move about and to leave the area at any time. And at no time were any efforts made to effect an arrest on either Mr. Packard or Mr. Duran. Instead,

the sole purpose of the force used was directed to efforts to maintain the integrity of the gas canisters and in response to the efforts to move the riotous crowd while best attempting the ensure officer safety, the safety of other protestors, and the protection of property.

In each case, then, and unlike the circumstances presented here, plaintiffs' engagement with police took place in circumstances of a direct confrontation with individuals rather than in the context of close association with protest groups engaged in unlawful conduct. Moreover, and also entirely dissimilar to the circumstances presented here, the force used was in connection with efforts to effect an arrest or after the plaintiffs were in custody. *Id.* Thus, not only do the facts and circumstances presented in *Buck* and *Fogarty* diverge so materially from those at issue here as to preclude their clearly establishing the law, but the facts in those two cases are much more readily suited to an analysis within the framework of *Graham* v. *Connor*, 490 U. S. 386 (1989), which the District Court also mistakenly relied on in finding the law clearly established. [App. Vol. VII at 1762-64].

The provisions of *Graham* are well-known, with the relevant analytical factors including: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. However, as this Court has recently recognized, "a qualified immunity

excessive force case does not always call for an analysis under *Graham*. The Supreme Court has observed that 'general statements of the law are not inherently incapable of giving fair and clear warning to officers,' and '*Graham* do[es] *not by [itself] create clearly established law outside an obvious case*.' *Hemry v. Ross*, 2023 U.S. App. LEXIS 5705, *16-17 (10th Cir. 2023) (emphasis added) (quoting *White v. Pauly*, 580 U.S. 73, 80 (2017)); *see also Plumhoff*, 572 U.S. 779 (emphasizing that *Graham* is "cast at a high level of generality."). And indeed, the chaotic circumstances presented to the Aurora Officers here is not the sort of "obvious case" to which *Graham* applies. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (discussing *Graham*'s application and noting, "Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness."). Yet, this is precisely the course of action taken by the District Court here.

Although not a mass protest or riot case, *Hemry* is also instructive insofar as it provides additional guidance related to an analysis of clearly established law in the context of a claim of excessive force against a closely-associated bystander. In *Hemry,* as part of law enforcement efforts to locate an individual wanted for murder, both Mr. Hemry and his wife were held at gunpoint by park rangers until local law enforcement arrived on scene and determined was not the person wanted. *Hemry*,

2023 U.S. App. LEXIS 5705, at *2-4. The Hemrys sued, claiming a violation of their Fourth Amendment rights and specifically for excessive force. The district court denied the rangers qualified immunity and concluded the officers acted with excessive force. *Id.* at *4. This Court reversed, finding that the law related to the rangers' actions was not clearly established, insofar as Mr. Hemry posed a plain, deadly threat, and the rangers' use of firearms on Mrs. Hemry—who was not otherwise associated with Mr. Hemry and was not sought for any wrongdoing— reasonably vindicated their well-established safety interest. *Id.* at *11. Disagreeing with the district court's analysis of the Tenth Circuit cases which served as the basis for the district court's denial of qualified immunity, the *Hemry* Court found there were material differences in the facts. *Id.* And in so doing, the Court reemphasized the "fact intensive nature" within the qualified immunity context—ultimately concluding that the force between Mr. Hemry and Mrs. Hemry may have differed, but the analysis as to each was not easily untangled from the other. *Id.* at *18-21. And with notable specific reference to the use of guns on Mrs. Hemry, and in distinguishing *Cortez v. McCauley*, 478 F.3d 1108 (10th Cir. 2007) (upon which the district court relied in denying qualified immunity), this Court found that "it would have been unreasonable for the officers to discount Mrs. Hemry as a dangerous threat merely because she was clearly not [the murder suspect]. Mrs. Hemry appeared as an unknown quantity beside a suspected dangerous criminal, her body partially

obscured by a vehicle at a distance. *Cortez* did not clearly require the rangers to point guns only at Mr. Hemry for their protection—assuming such precision was at all times even possible." *Id.* at *23.

The *Hemry* Court's consideration thus advises the circumstances presented here: Mr. Packard was engaged in unlawful interference with a gas canister in close proximity to a group of protestors at the time he was struck by less-lethal munitions, and Mr. Duran was in close proximity to a group of protestors engaged in similar conduct and throwing projectiles at police. It therefore would have been unreasonable for the Aurora Officers to fail to utilize less-lethal force in those circumstances, just as it would have been unreasonable for the rangers in *Hemry* to discount Mrs. Hemry as a threat when she appeared in the scenario as an "unknown quantity." Most specifically, the Court could not "identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *Id.* The same is true here.

Ultimately, the District Court's and Plaintiffs' reliance on *Graham* v. *Connor*, [App. Vol. VII at 1762-64; Aplee. Br. P. at pp. 33-34; Aplee. Br. D. at pp. 34-35], to clearly establish the law in this case is misplaced. *Graham* holds only that the "objective reasonableness" test applies to excessive force claims under the Fourth Amendment. *Graham* at 338. That is far too general a proposition to control this case. Instead of applying broadly sweeping concepts, the District Court's analysis

should have probed deeper and examined with specificity the facts in *Buck* and *Fogarty*, which do not clearly establish that Officer McNamee was prohibited from using less-lethal munitions on protestors throwing or kicking canisters back in the direction of the police; or that Sergeant Serrant was prohibited from instructing his officers to use less-lethal munitions on protestors kicking gas canisters; or that Officer Budaj was prohibited from using less-lethal munitions on people who were engaged in activity that threatened officer safety. Indeed, the District Court's statement that "the law is clearly established that an officer cannot shoot a protestor with pepper balls or other less-lethal munitions when that protestor is committing no crime more serious than a misdemeanor, not threatening anyone, and not attempting to flee," [App. Vol. VII at 1763], states the rule at too high a level of generality, and does not take into account the circumstances in which the Aurora Officers found themselves. As such, the Aurora Officers are entitled to qualified immunity here.

**III.    The District Court erred in finding there was a constitutional violation by the Aurora Officers.**

No violation of the Fourth Amendment will lie without a seizure. Relying on *Torres v. Madrid*, 141 S. Ct. 989 (2021), Plaintiffs urge this Court to interpret a seizure in the broadest possible fashion. In support, Plaintiffs cite to a Ninth Circuit case, *Nelson v. City of Davis*, 685 F.3d 867, 875-76 (9th Cir. 2012).  However, in a 2021 decision *Dundon v. Kirchmeier*, 577 F. Supp. 3d 1007 (D.N.D. 2021), the Court is presented with the very question of whether the law enforcement use of

force through less-lethal munitions in a large crowd-control context can constitute a

seizure under the Fourth Amendment. *Id.* at 1036. In *Dundon*, the Defendants argued

the Plaintiffs were not "seized" for Fourth Amendment purposes because Plaintiffs

were not arrested or detained at any point by law enforcement, nor were they advised

by law enforcement they were not free to walk away from the confrontation between

law enforcement and protestors. *Id*. Defendants also asserted their intention in using

less-lethal force was to cause the protestors to disperse and move away from law

enforcement, not to arrest them or detain them. *Id.* at 1035. In the instant matter,

although Mr. Packard was injured and unable to leave the protest on his own accord,

neither Officer McNamee nor Officer Budaj made any effort arrest or otherwise

seize Mr. Packard or Mr. Duran. Thus, the issue at hand centers more on whether

a seizure can occur from an indirect physical touch by law enforcement through less-

lethal force in a crowd-control context. *Id.* at 1037. In *Dundon*, the Defendants

argued that an officer must have an intent to secure government control over the

subject and that the "application of physical force, without such an objective

manifestation of intent, does not constitute a seizure under the Fourth Amendment."

*Id.* at 1038. The *Dundon* Court also turned to *Torres v. Madrid* (noting that case

addressed the context of apprehending a suspect) to support this notion, quoting:

> We stress, however, that the application of the common
> law rule does not transform every physical contact
> between a government employee and a member of the

public into a Fourth Amendment seizure. A seizure
requires the use of force *with intent to restrain*. Accidental
force will not qualify. Nor will force intentionally applied
for some other purpose satisfy this rule. In this opinion, we
consider only force used to apprehend. We do not accept
the dissent's invitation to opine on matters not presented
here—pepper spray, flash-bang grenades, lasers, and
more. *Torres*, 141 S. Ct. at 998.

As part of its analysis the *Dundon* Court drew a distinction in determining

whether a group of hundreds, if not over a thousand individuals facing off with a

clearly outnumbered presence of law enforcement were unreasonably seized by

officers' use of less-lethal munitions to disperse, rather than with the intent to detain

them. *Id.* at 1039.  The Court considered other cases within the context of crowd

control but found in each a distinguishing feature, that protestors were encircled and

not free to leave. Ultimately, the *Dundon* Court concluded there was "no seizure."

*Id.* at 1040.

The same is true here with respect to the circumstances confronting the Aurora

Officers. The record evidence demonstrates that no effort was made by the Aurora

Officers to utilize less-lethal munitions in the crowd control context with an intent

to restrain, and Sergeant Serrant's order to utilize less-lethal munitions on those

interfering with gas canisters does not manifest that intent. Therefore, neither Mr.

Duran nor Mr. Packard were "seized" for purposes of the Fourth Amendment, and

no constitutional violation occurred.

16

Moreover, excessive force claims "are analyzed under a 'reasonableness' standard." *Hemry*, 2023 U.S. App. 5705, at *16. Moreover, "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 398). Critically, "[t]hat perspective includes an 'examination of the information possessed by the officers.'" *Id.* (quoting *Weigel v. Broad*, 544 F.3d 1143, 1152 (10th Cir. 2008)). Thus, "[b]ecause '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, its proper application requires careful attention to the facts and circumstances of each particular case ....'" *Id.* (quoting *Graham*, 490 U.S. at 396). Here, consistent with the requirement that reasonableness take into account the "information possessed by the officers," the undisputed record facts the Aurora Officers have set forth are advanced to provide context into the perspective and thought processes of reasonable officers on scene.

Here the undisputed evidence is that as Officer Budaj was moving down Colfax, a firecracker can be seen exploding in the air and in front of the line. [App. Vol. II at 409-412 (conventionally submitted video Exhibit I, at video counter 21:34:37-39)]. An officer can then be heard asking another officer if that officer is "all right," firecrackers can be heard exploding and can be seen being launched in the direction of officers. [*Id.* at video counter 21:35:14-25]. The Bearcat vehicle

17

traveling with the officers appears to have been hit multiple times with some form of projectile that left white marks, [*Id.* at video counter 21:35:49], and what sounds like a bottle breaking can be heard. [*Id.* at video counter 21:37:54]. As the Bearcat vehicle continues to crawl toward a group of protesters in the middle of the street, what sounds like projectiles hitting in and around officers, including one that sounds to have hit the Bearcat, can be heard. [*Id.* at video counter 21:38:32-38].

Plaintiff Duran's own video recording reveals similar actions. [App. Vol. II at 409-412 (conventionally submitted video Exhibit J)]. On that video, Mr. Duran can be immediately heard saying "move back" while protesters can be seen in close proximity behind a yellow dumpster that had been pushed into the street, and an umbrella can also be seen in a downward position pointed toward the line of officers who are advancing down the street. [*Id.* at video counter 00:01-04]. Then, just in front of where Mr. Duran is positioned and filming, what looks to be a gas canister can be seen being thrown back toward the line of officers, and protesters can be seen with helmets gas masks, goggles and shields. [*Id.* at video counter 00:05-13]. Three seconds later, a large firework can be seen going off in front of the line of officers, and immediately thereafter as he is moving, Mr. Duran states, "Oh, I just got hit in the dick … I got hit right in the junk." [*Id.* at video counter 00:16-23]. Approximately eight seconds after that, a protestor can be seen throwing something toward the direction of the police line. [*Id.* at video counter 00:35]. Mr. Duran describes the

feeling like a "junior high kick in the balls," and says it hurts but states he is walking. [*Id.* at video counter 01:17-01:25]. By his own description, Mr. Duran states, "Denver tonight is a war zone," and a "cat and mouse game." [*Id.* at video counter 03:36-03:44]. Additionally, the size of the crowd can also be seen. [*Id.* at video counter 5:17-06:13]. As the crowd swells, @06:49, a firecracker can be seen flying back toward the line of officers. [*Id.* at video counter 06:49].

In this context, the Aurora Officers use of and authorization to use less-lethal munitions was reasonable under the totality of the circumstances. "What is reasonable in the context of a potentially large-scale urban riot" is different from what is reasonable in other, relatively calm, situations. *See Bernini v. City of St. Paul*, 665 F.3d 997, 1003 (8th Cir. 2012); *see also Jurkowski v. City of Seattle*, 2017 WL 4472859, *9-10 (W.D. Wash. 2017) (citing *Bernini*, 665 F.3d at 1003). There are circumstances when a City has a "legitimate interest in quickly dispersing and removing lawbreakers with the least risk of injury to police and others." *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994). The government has a safety interest in controlling large groups of people, and force can be justified when protestors substantially outnumber officers and refuse to obey commands to disperse. *See Jackson v. City of Bremerton*, 268 F.3d 646, 652-53 (9th Cir. 2001). Even in instances where the potential for criminal activity involves only low-level misdemeanors, the government has a significant interest when the occurrence is

widespread. *See Forrester*, 25 F.3d at 807; *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 287 (1993) (Kennedy, J., concurring) ("[T]he wholesale commission of common state-law crimes creates dangers that are far from ordinary. Even in the context of political protest, persistent, organized, premeditated lawlessness menaces in a unique way the capacity of a State to maintain order and preserve the rights of its citizens.").

In light of the foregoing, Officer McNamee's use of less-lethal munitions, in response to Mr. Packard kicking the gas canister back toward officers, was not unconstitutional given the totality of the circumstances presented. *See* [App. Vol. VII at 1711 (conventionally submitted video Exhibit 4, at video counter 8:43:29 – 8:46:00, showing protesters hurling incendiary devices)]. In this regard, the District Court drew a distinction—without any citation to legal authority in the Supreme Court, the Tenth Circuit, or elsewhere—that using less lethal munitions against a person who kicks a gas canister requires a decisively different police response then does the response if someone were to have thrown a gas canister toward or in the direction of the police line. [App. Vol. II at 1762-64]. The District Court's unsupported efforts to distinguish a reasonable response from an unreasonable one in these circumstances becomes further blurred when considering the analyses undertaken by other courts in the same circumstances, and finding that a distinction between thrown and kicked canisters is far less important than the simple fact that

sending gas canisters back toward police assaultive behavior that impacts officer safety and justifies the use of less-lethal force.

For example, in *Don't Shoot Portland v. City of Portland,* 503 F. Supp. 3d 1022 (D. Or. 2020), the Court analyzed whether the City was in violation of a Temporary Restraining Order and, therefore, in contempt, when its officers used less-lethal munitions on protesters who tampered with gas canisters, including some who kicked the canisters back toward police line. *Don't Shoot Portland,* 503 F. Supp. 3d at 1035. In relevant part, the *Don't Shoot* Court considered four different incidents: 1) when a protester "spontaneously" kicked a smoke canister away in the direction of the police line, officers fired two 40mm less-lethal rounds—both rounds hitting the protester, and additional munitions were fired as the protester was retreating, *Id.* at 1029-1030; 2) after the sun had set, a protester moved to kick a smoke munition away, after one landed near the protester's feet in an effort to distance herself from the munition, *Id.* at 1030; 3) when a protester, who had live-streamed numerous protests, saw an inert smoke canister roll near his position and as he took steps forward to inspect and pick up the canister, he was hit in the groin with a munition before ever making contact with it, *Id.* at 1030-31; and, 4) after protesters moved recycling bins, trash cans, and dumpsters into the street, one of which was set on fire, police fired a 40mm less-lethal green marking round at the

individual while protesters continued to throw rocks, bottles, full cans of beer, and smoke bombs at the police line, *Id.* at 1030.

In each of these scenarios, and finding no violations of the Court's previously entered restraining order, the Court observed that thrown smoke canisters become dangerous projectiles, due to their weight and temperature, and kicked smoke canisters encompass officers instead of the protesters, thereby limiting officers' visibility. *Id.* at 1035. The court further observed that the act of kicking canisters back at police can be part of a coordinated attack – on the part of some protesters – by enveloping officers in smoke from their own munitions, protesters have a clear line of sight to throw projectiles at police officers. *Id.* The court thereby concluded that the use of 40mm impact munitions in the above scenarios did not violate the Court's previous order. *Id.* The Court further found that the individuals "were just a few of many protesters who were kicking or throwing smoke canisters and other projectiles at the police line," as is the case here. *Id.* The Court went on to conclude that while those individuals may not have subjectively intended to assault or threaten to assault officers that evening, kicking or throwing smoke canisters constitutes a threat or act of assault, and the officers reasonably perceived the actions of the plaintiffs as active aggression and the use of impact munitions was appropriate. *Id.* Furthermore, the Court found that the deployment of munitions against unknown individuals who attempted to throw items at police officers and another individual

who attempted to light a dumpster on fire complied with use of force directives insofar as throwing items at police and starting fires at a protest reasonably constitutes a threat or an overt act of assault and creates a risk of injury to officers or others without intervention. Thus, in the moments that the officers deployed impact munitions they reasonably perceived that these individuals were engaged in active aggression.

While not controlling, the Court's analysis in *Don't Shoot Portland* is persuasive when measured against the District Court's wholly unsupported finding in this case that flinging gas canisters toward officers somehow does not constitute a reasonable threat justifying the use of less-lethal munitions. In that regard, both the actions of Officer Budaj with respect to Mr. Duran, in utilizing less-lethal munitions toward his position in close proximity to a group of protestors sending gas canisters and other projectiles at officers, and the actions of Officer Packard with respect to Mr. Packard, utilizing less-lethal munitions in response to Mr. Packard sending a gas ganister back toward officers, were constitutionally reasonable under the circumstances.

Finally, with regard to the supervisory liability claim against Segreant Serrant, and in light of the foregoing, there was nothing unconstitutional in Sergeant Serrant's direction to use less-lethal munitions on individuals interfering with gas canisters—and certainly no clearly-established law to that end. This is critical

because pursuant to § 1983, "government officials are not vicariously liable for the misconduct of their subordinates." *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006). Rather, to assert a claim on the basis of supervisory liability, a plaintiff must plausibly allege "an 'affirmative link' between the supervisor and the violation, namely the active participation or acquiescence of the supervisor in the constitutional violation by the subordinates." *Id.* (quoting *Holland v. Harrington*, 268 F.3d 1179, 1187 (10th Cir. 2001)). Furthermore, liability may not be based upon "mere negligence"—the plaintiff "must establish that the supervisor acted knowingly or with 'deliberate indifference' that a constitutional violation would occur." *Id.* (quoting *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997)). Accordingly, Mr. Packard must establish that Sergeant Serrant individually and personally violated his constitutional rights or approved of such violation. In light of the fact that it was reasonable for Sergeant Serrant to direct his officers to use less-lethal munitions on individuals interfering with gas canisters—insofar as there is no legal authority to the contrary—then Sergeant Serrant's actions in giving that command were not constitutionally infirm. The Aurora Officers therefore committed no constitutional violation in this case, and the District Court's Order must be reversed.

**IV.    The District Court erred in allowing a Fourth and Fourteenth Amendment claim to proceed simultaneously.**

In instances where a plaintiff brings both Fourth and Fourteenth Amendment claims that arise out of the same conduct by defendants, the two claims may not proceed simultaneously. *See Graham*, 490 U.S. at 395 (1989); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (noting that substantive due process analysis is inappropriate where a claim is covered by the Fourth Amendment). Excessive force claims arising out of an arrest or seizure are evaluated under the Fourth Amendment using an "objective reasonableness" standard, which covers "excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen"). *Id.* at 397-98 Where plaintiffs do not allege "that they were arrested or seized," courts analyze the use of excessive force under the Fourteenth Amendments more stringent "shocks the conscience" standard. *Tierney v. Davidson*, 133 F. 3d 189, 199 (2d Cir. 1998). Here, Plaintiffs claim they were seized and the District Court recognized that the claims were governed by the Fourth Amendment, and conducted its analysis accordingly. The Fourteenth Amendment claim should thus not have been allowed to proceed. *See In Fraser v. City of New York*, 2022 U.S. Dist. LEXIS 137335 *5 (E.D.N.Y. 2022).

**V.     Should this Court find that the Aurora Officers did not commit a constitutional violation, then the City of Aurora should be dismissed.**

Although the City of Aurora, does not enjoy the benefits of qualified immunity, Plaintiffs have failed to show that the Aurora Officers committed a constitutional violation, as required for municipal liability. *See Myers v. Okla. Cty.*

*Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1317 (10th Cir. 1998). As such, if this Court finds that defendants are entitled to qualified immunity under the first prong of a qualified immunity analysis, then the claims against the City must also be dismissed. *Martinez v. City of Aurora*, 2016 U.S. Dist. LEXIS 2272 *22 (D. Colo. 2016); *see also Crowson v. Wash. Cty. State of Utah*, 983 F.3d 1166, 1185 (10th Cir. 2020) (finding the appellate court has discretion to exercise pendent jurisdiction over the County's appeal to the extent the issues it raises are "inextricably intertwined" with the district court's denial of qualified immunity to the individual defendants.)

## CONCLUSION

For the foregoing reasons, as well as those articulated in Appellants' Opening Brief, the District Court's Order should be reversed. The Aurora Officers are entitled to qualified immunity, and should this Court find no constitutional violation by the Aurora Officers, the City of Aurora should be dismissed as well.

Dated this 24th day of March, 2023.

*s/ Michael T. Lowe*
Michael T. Lowe
David M. Goddard
Heidi J. Hugdahl
Bruno, Colin & Lowe, P.C.
1999 Broadway, Suite 4300
Denver, Colorado 80202
Telephone: (303) 831-1099
E-mail: mlowe@brunolawyers.com;
dgoddard@brunolawyers.com;
hhugdahl@brunolawyers.com
*Attorneys for Defendant-Appellants*

> *s/ Peter R. Morales*
> Peter R. Morales
> Office of the City Attorney
> Aurora Municipal Center, Suite 5300
> 15151 East Alameda Parkway
> Aurora, CO 80012
> Telephone: (303) 739-7030
> E-mail: pmorales@auroragov.org
> *Attorneys for Defendants-Appellants*
> *City of Aurora*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this **DEFENDANTS-APPELLANTS' REPLY BRIEF** was electronically filed via CM/ECF on this 24th day of March, 2023, with service to all counsel of record.

> *s/ Julie Bozeman*
> Julie Bozeman, Paralegal
> Bruno, Colin & Lowe, P.C.

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)     all required privacy redactions have been made 10th Cir. R. 25.5;

(2)      if required to file additional hard copies, that the ECF submission is an
            exact copy of those documents; and

(3)     The digital submissions have been scanned for viruses with the most recent
         version of a commercial virus scanning program, Webroot SecureAnywhere
         Antivirus updated daily and according to the program are free of viruses.

Dated this 24th day of March, 2023.

*s/ Michael T. Lowe*
Michael T. Lowe
Attorney for Defendants-Appellees
Bruno, Colin & Lowe, P.C.
1999 Broadway, Suite 4300
Denver, Colorado 80202
Telephone: (303) 831-1099
E-mail: mlowe@brunolawyers.com

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1.      This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,494 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Local Rule 32.

2.      This brief complies with the type face requirements of Fed. R. App. P. and Local Rule 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman.

Dated this 24th day of March, 2023.

> *s/ Michael T. Lowe*
> Michael T. Lowe
> Attorney for Defendants-Appellees
> Bruno, Colin & Lowe, P.C.
> 1999 Broadway, Suite 4300
> Denver, Colorado 80202
> Telephone: (303) 831-1099
> E-mail: mlowe@brunolawyers.com

## CERTIFICATE OF EXACT COPIES

I hereby certify that pursuant to Fed. R. App. P. 25(e) and Section VII.D of the Practitioner's Guide to the United State Court of Appeals for the Tenth Circuit, Eleventh Edition – January 2021 (Tenth Circuit Rules effective Jan. 1, 2021), within five (5) business days of notice that the electronically filed brief is compliant, I will cause seven (7) paper copies of the foregoing to be delivered to the Clerk of Court via hand delivery. I further certify that the seven (7) paper copies will be exact copies of the electronically submitted version.

Dated: March 24, 2023.          *s/ Julie Bozeman*
                                              Julie Bozeman, Paralegal
                                              Bruno, Colin & Lowe, P.C.